IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

CLYDE WENDELL SMITH                                                    PLAINTIFF

V.                                                          NO: 4:07CV43-WAP-EMB

CHRISTOPHER B. EPPS, ET AL.                                          DEFENDANTS

**REPORT AND RECOMMENDATIONS**

Before the court is a pro se civil rights complaint filed by the plaintiff, Clyde Wendell Smith, on March 27, 2007. An evidentiary hearing was conducted by United States Magistrate Judge Eugene Bogen on May 15, 2008, in Greenville, Mississippi. After hearing the testimony presented during the hearing, Magistrate Bogen made oral factual findings on the record. However, Magistrate Bogen retired prior to entering any written report and recommendation, and this case was eventually reassigned and referred to the undersigned magistrate judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B). Having reviewed the record, including all of the testimony and documentary evidence introduced at the evidentiary hearing and Judge Bogen's findings made on the record, the court rules as follows:

**1. The Complaint**

This case involves a civil rights action under 42 U.S.C. § 1983 filed by Smith against the defendants for violation of his constitutional rights. Specifically, Smith claims the defendants violated his rights under the First Amendment by refusing to deliver incoming and outgoing mail written in the French language. He also contends the defendants retaliated against him for filing a grievance and making derogatory comments regarding inspection of his mail.

The complaint alleges that Smith had been sending and receiving mail written in French since March 2003. It further states that Smith was placed on "mail censorship" on June 13, 2005, for violating mail privileges. The complaint alleges that Smith filed a request for administrative remedy ("ARP") regarding the decision to place him on "mail censorship," and that his request was denied. It states that shortly thereafter, in a letter to a friend, Smith wrote that "prison officials here was [sic] stupid for sitting around opening and reading my mail while inmates in this Unit was [sic] running around stabbing each other." According to the complaint, shortly after making this statement in the letter, Linda Weeks began refusing to deliver Smith's incoming and outgoing mail written in French.[1] Additionally, the complaint states that Smith believes Weeks refused to deliver his mail only to "harass" him for filing a grievance about his mail being opened, letters going missing, and mail being read and occasionally destroyed and for criticism of prison officials. Smith contends this claim is supported by the fact that he was on mail censorship for an entire year before his letters written in French were stopped; his mail was not stopped until after he filed a grievance and criticized prison officials in one of his letters; and his "incoming letter of September 19, 2006" was destroyed because he refused to pay postage to have it returned, and as far as he knew, no other inmate had to pay postage to have a letter returned; and prison officials didn't start reading his mail until June 13, 2005. Smith has named as defendants Linda Weeks, Christopher Epps, and Lawrence Kelly.[2] He seeks compensatory

---

[1]According to the complaint, Weeks refused to deliver six letters intercepted on June 8, 2006, August 14, 2006, September 19, 2006, October 20, 2006, October 24, 2006, and October 31, 2006, respectively.

[2]At all relevant times, Linda Weeks was postal supervisor at the Mississippi State Penitentiary ("MSP") in Parchman, Mississippi. Christopher B. Epps and Lawrence Kelly served as Commissioner of the Mississippi Department of Corrections ("MDOC") and Superintendent

and punitive damages and injunctive relief.

## 2. Standard of Review in Section 1983 Actions

To state a claim under 42 U.S.C. § 1983, a complaint must allege: (i) the conduct complained of was committed by a person acting under color of state law and (ii) the conduct deprived a person of a right, privilege, or immunity secured by the Constitution or laws of the United States. *Parratt v. Taylor,* 451 U.S. 527, 535 (1981), *overruled on other grounds*; *Daniels v. Williams,* 474 U.S. 327 (1986).

A plaintiff also must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint. *Mouille v. City of Live Oak, Tex.,* 977 F.2d 924, 929 (5th Cir. 1992). A person will be held to deprive another "of a constitutional right, within the meaning of section 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that *causes* the deprivation of which [the plaintiff complains]." *Leer v. Murphy,* 844 F.2d 628, 633 (9th Cir.1988) (emphasis in original) (citation omitted). The court's inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Id.*

A defendant, furthermore, cannot be held liable under 42 U.S.C. § 1983 solely on the basis of supervisory responsibility or position. *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 694 n. 58 (1978). A theory of *respondeat superior* thus is not sufficient to state a section 1983 claim. *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987).

---

of MSP, respectively, at all relevant times.

## 3. Law & Analysis

A. Smith's First Amendment Claim

In this case, Smith alleges the defendants refused to deliver six pieces of incoming and outgoing mail written in French. As an exhibit to his complaint, Smith attached six notices from the MDOC Postal Inspection Department indicating that mail was not being delivered because it could not be translated. Only one of the notices related to incoming mail, and that mail had been received from an individual in France. Additionally, this letter indicated that it would be returned to the sender at Smith's request upon payment of $.84. All of this mail was intercepted between June 2006 and October 2006.

Prisoners generally have "a First Amendment right to send and receive mail." *See Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). However, a prison may adopt regulations which impinge on an inmate's constitutional rights if those regulations are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Security is a legitimate penological interest. *See id.* at 89-92.

Prison officials have more leeway to regulate incoming than outgoing mail because of the greater security risks inherent in materials coming into the prison. *Thornburgh*, 490 U.S. at 413. The standard set out in *Turner, supra*, is applicable to regulations and policies regarding incoming mail. *See Turner*, 482 U.S. at 89. When a prison regulation affects outgoing mail, however, there must be a "closer fit between the regulation and the purpose it serves." *Abbott*, 490 U.S. at 412. In order to legitimately censor outgoing mail, prison officials must show two things. First, "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." *Martinez*, 416 U.S. at 413.

4

The Supreme Court has recognized that security, order and rehabilitation are all substantial governmental interests. *Thornburgh*, 490 U.S. at 413. Second, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id*.

      1. *Smith's Incoming mail*

To determine the reasonableness of the mail regulation as it relates to the one piece of incoming mail at issue, there are four factors that are relevant to consider. *Turner*, 482 U.S. at 89. "First, there must be a 'valid, rational connection'" between the challenged action and "the legitimate governmental interest put forward to justify it." *Id*. (citation omitted). The second *Turner* factor is whether alternate means exist for inmates to exercise their constitutional rights. *Id*. at 90. The third *Turner* factor requires consideration of the impact that accommodation of the asserted constitutional right would have on guards, inmates, and the allocation of prison resources. *Id.* Lastly, the court should consider whether alternatives to the prison regulation are available at a "*de minimus* cost." *Id*. at 90-91. The regulation may be struck down if its relationship to the government objective is "so remote as to render the policy arbitrary or irrational." *Id*. at 89-90.

The court finds the first *Turner* factor has been satisfied. As noted above, "there must be a 'valid, rational connection'" between the challenged action and "the legitimate governmental interest put forward to justify it." The action "cannot be sustained where the logical connection" between it and "the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, *supra*, at 89-90. Additionally, the governmental objective or interest also "must be a

5

legitimate and neutral one."[3] *Id*. at 90. That is, the particular action at issue must operate "in a neutral fashion, without regard to the content of the expression." *Id*.

Lawrence Kelly testified that the policy at issue required that all of the mail of inmates placed on mail censorship be read. He said the policy was put in place as a security procedure designed to investigate and detect escape plans and other criminal activities. Additionally, Kelly testified that the policy served to deter prisoners from violating mail rules. Both Kelly and Weeks testified that Smith's mail was not delivered only because no prison official could readily interpret it as required by the censorship policy. Kelly further testified that accommodations were available under the policy, however, for inmates who did not speak English and for those who corresponded with legal advisors in foreign languages. Based on this evidence, the court finds the prison's interest in maintaining the safety and security of the prison and the discipline of the prisoners is a legitimate purpose. Additionally, the court finds the censorship policy is content neutral and only restricted the form and not the content of the communication. Smith's mail written in French was withheld solely on the basis of its implication for prison security, and it is apparent that mail received by inmates written in foreign languages that cannot be translated poses a potential security threat. *See Abbott*, 490 U.S. at 415-16 (upholding prison regulations which made distinctions between various publications based solely on the different potential security implications).

---

[3]The term "neutrality" was intended by the Supreme Court "to go no further than" require that the practice in question "further an important or substantial governmental interest unrelated to the suppression of expression." *Thornburgh*, 490 U.S. at 415. Where "prison administrators draw distinctions between" types of mail "solely on the basis of their potential implications for prison security," the practice is deemed to be "neutral." *Id.* at 415-16 (goal of protecting prison security central to all other corrections goals).

The second *Turner* factor is whether there are alternative means of exercising the right at issue. The most obvious alternative means for Smith to exercise his right to communicate with his friends is for him to communicate with them in English. Smith testified that his friends did not speak or read English. However, there was no showing that these friends did not have access to any means by which they could have letters written in English translated or their letters translated into English for Smith's benefit. Therefore, the court concludes that there are alternative means for Smith to exercise his right to communicate with his French-speaking friends.

The third *Turner* factor is the impact the accommodation of this right will have on the inmates, the guards and the prison as a whole. "When accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." *Turner*, 482 U.S. at 90. The court finds that under the facts of this case, it is apparent that accommodation of the right at issue could have a significant impact on the internal security of the prison. Kelly testified that the mail censorship policy only applied to inmates who had already proven to be security or escape risks or who had circumvented the mail rules, and that it was put in place to protect the safety and security of the prison. If Smith were allowed to receive correspondence in foreign languages that could not be interpreted by prison officials, it could potentially have a significant "ripple effect" on other inmates on mail censorship demanding the right to receive correspondence in an unlimited number of foreign languages that could not be readily interpreted by prison officials. Accordingly, this factor weighs against Smith.

Finally, under the fourth *Turner* factor, the court is required to explore whether obvious,

7

easy alternatives to the restriction exist. A prison regulation does not have to pass a "least restrictive alternative" test, but "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at a *de minimus* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Turner*, 482 U.S. at 90-91. In this case, Smith has failed to offer any competent evidence of a reasonable alternative to the restriction on his use of French. During the hearing, he suggested in questions to Weeks on cross-examination that there were internet websites which translated various languages and that he had previously brought this to her attention in an "offender request form." However, Smith failed to produce any such form, and Weeks denied knowledge of the form and knowledge of any such websites. Accordingly, this factor must also be weighed against Smith.

Based on the foregoing, the court finds no constitutional violation occurred with respect to Smith's incoming mail.

2. *Smith's Outgoing Mail*

The first consideration under *Martinez* is whether the defendant has shown that her decision to censor the plaintiff's mail furthered a substantial governmental interest unrelated to suppression of expression. Kelly's undisputed testimony was that the policy of reading all mail of inmates on mail censorship furthered the important governmental interest of security at the prison. Furthermore, Kelly's and Weeks's testimony established that Smith was on mail censorship because he circumvented mail procedures by sending out mail for another inmate who was an escape risk and that Smith's mail written in French was disallowed only because it could not be readily interpreted. Based on this, the first *Martinez* factor has been satisfied.

8

Next, "the limitation of First Amendment freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved." *Id*. In this case the court finds the decision to disallow Smith's mail was no greater an infringement upon his First Amendment rights than necessary to protect the prison's interest in security. Indeed, at all times, the plaintiff was free to correspond with whomever he wished, and he could have rewritten all of his outgoing letters in English. Again, Smith failed to provide any proof that his friends did not have any means by which to have correspondence written in English translated into French. Moreover, as pointed out above, Kelly's undisputed testimony was that the regulation allowed accommodations for non-English speaking inmates and for legal mail written in foreign languages. Therefore, there was no constitutional violation with regard to Smith's outgoing mail.

B. Retaliation Claim

As an initial matter, Smith has neither put forth any evidence nor alleged that defendants Lawrence Kelly and Christopher Epps committed an affirmative act or omitted to do some act as it regards his retaliation claim. During the evidentiary hearing, he specifically testified that his claim was based upon the actions of Linda Weeks. Because it is apparent that his retaliation claim against Kelly and Epps is based upon their supervisory responsibility and/or positions, the claim should be dismissed as to these individuals for failure to state a claim.

During the evidentiary hearing, Smith testified that though he was placed on mail censorship in June 2005, his mail written in French was not stopped until June 2006. He testified that he was allowed to send out mail written in French before he made the comment in a letter to a friend in the U.S. that prison officials were "stupid for sitting around opening and reading my mail while you [sic] have these inmates running around stabbing each other." Further, Smith

9

testified that even after the "ban" on correspondence written in French was enforced in 2006, Weeks allowed some mail written in French, including letters, cards, and newspaper clippings, to be forwarded to him. He said that this indicated to him that Weeks banned only some of his mail because she took offense to his comments.

To prevail on a claim of retaliation, a prisoner must establish "(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *McDonald v. Steward,* 132 F.3d 225, 231 (5th Cir. 1998). Causation requires a showing that "but for the retaliatory motive the complained of incident . . . would not have occurred." *Johnson v. Rodriguez*, 110 F.3d 299, 310 (5th Cir. 1997) (quoting *Woods*, 60 f.3d at 1166). "The inmate must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). In this case, the plaintiff has failed to meet his burden of proving each element of his claim.

First, though he initially alleged in the complaint that Weeks retaliated against him because he filed a grievance and made negative comments about prison officials in a letter, he did not present any evidence regarding such a grievance during the evidentiary hearing. Indeed, during his testimony he clearly said that his retaliation claim was based upon Linda Weeks' retaliating against him because he made negative comments about prison officials in a letter to a friend. Nevertheless, the court finds Smith has sufficiently asserted a constitutional right because prisoners generally have a First Amendment right to publicly criticize prison officials. *See Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995); *Gibbs v. King*, 779 F.2d 1040, 1046 (5th Cir. 1986) (quoting *Ruiz v. Estelle*, 679 F.2d 1115, 1153 (5th Cir. 1982).

The court can end its inquiry at the next element, however, because Smith failed to adduce evidence sufficient for the court to infer a retaliatory motive. Beyond his own conclusory statement that Weeks "banned" his mail because she took offense to his comments, at no point during the evidentiary hearing was any evidence presented to establish that Weeks had knowledge of the contents of his letter containing the negative comments about prison officials. *See McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998) (finding plaintiff failed to prove retaliatory intent where there was no evidence presented at trial showing the defendant acted with improper motives). Moreover, on cross-examination Weeks testified that she did not read every piece of mail that came through her department. Therefore, because there is no evidence that Weeks knew about Smith's comments, there is insufficient proof of retaliatory intent, and Smith's retaliation claim must be dismissed as well.

### 4. Recommendation

Based on the foregoing findings and conclusions, it is my recommendation that a judgment be entered in favor of the defendants and that the plaintiff's complaint be dismissed.

The parties are referred to Local Rule 72.2(D) for the applicable procedure in the event any party desires to file objections to the findings and recommendations herein contained. The parties are warned that any such objections are required to be in writing and must be filed within fourteen (14) days of this date. Failure to timely file written objections to the proposed findings, conclusions and recommendations contained in this report will bar an aggrieved party, except upon grounds of plain error, from attacking on appeal unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Respectfully submitted this 17th day of December, 2009.

                                            **/s/ David A. Sanders**
                                            **UNITED STATES MAGISTRATE JUDGE**